[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12781

_____

D.C. Docket No. 2:19-cv-14455-DMM

DAVID SOSA,

                                                            Plaintiff-Appellant,

versus

MARTIN COUNTY, FLORIDA,
SHERIFF WILLIAM SNYDER,
of Martin County, Florida in an official capacity,
DEPUTY M. KILLOUGH, individually,
DEPUTY SANCHEZ, individually,
JOHN DOE MARTIN COUNTY DEPUTIES,

                                                            Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 20, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

ROSENBAUM, Circuit Judge:

David Sosa may have cursed his luck when the Martin County Sheriff's Department pulled him over for a traffic violation in November 2014. "[W]hen ill luck begins, [though,] it does not come in sprinkles, but in showers."[1] And so it was for Sosa.

When the officer ran Sosa's name, the computer indicated an outstanding Harris County, Texas, warrant from 1992 for a different David Sosa (the "wanted Sosa"). Though some of the identifying details for the wanted Sosa and Sosa differed, the deputy arrested Sosa and took him back to the station. There, deputies fingerprinted Sosa, and he spent three hours in jail before they determined that he was not the wanted Sosa.

Three-and-a-half years later, it happened again! On April 20, 2018, the same Martin County Sheriff's Department (though a different deputy) stopped Sosa as he drove. Once again, the deputy checked Sosa's name in the computer system and found the same outstanding warrant for the wanted David Sosa. Sosa told the deputy about his mistaken 2014 arrest on that warrant and advised the deputy of differences between himself and the wanted Sosa. But once again, the deputy arrested him and took him back to the station. This time, though, Sosa had to spend three days and

---

[1] Mark Twain, *The Tragedy of Pudd'nhead Wilson*, American Publishing Co., Hartford, Conn. (1894), 181.

nights in jail before the Department acknowledged that he was not the wanted Sosa and finally released him.

Trying to avoid a third stay at the county jail for someone else's misdeeds, Plaintiff-Appellant Sosa filed this 42 U.S.C. § 1983 suit against the Defendants-Appellees Martin County Sheriff's Department and the deputies involved in the second incident.  In it, Sosa alleged that the Defendants-Appellees violated his Fourth and Fourteenth Amendment rights by falsely arresting him, overdetaining him, and failing to institute policies and train deputies to prevent these things from happening (the "*Monell* claim"[2]).  The district court dismissed the case with prejudice for failure to state a claim.  We now affirm the district court's rulings on the false-arrest and *Monell* claims and reverse on the overdetention claim.

Detention—and particularly protracted detention—of an innocent person obviously seriously interferes with that person's liberty interests.  So when a law-enforcement officer receives information that suggests that he has the wrong person in custody, the Fourteenth Amendment requires him to take some action to resolve those doubts.  Because Sosa sufficiently alleged facts establishing that Defendants-Appellees failed to take any action for three days and nights after they learned of information that raised significant doubts about Sosa's identity, we vacate the district court's order dismissing the overdetention claim and remand for further proceedings.

---

[2] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

**I.**

As we've mentioned, Sosa had the misfortune to be arrested and detained twice by Defendants on the same outstanding warrant for a different David Sosa. Before we summarize the allegations in more detail, we pause to note that this is an appeal of an order dismissing Sosa's case for failure to state a claim, so for purposes of our analysis, we accept as true the factual allegations from Sosa's First Amended Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

According to that filing, Sosa has lived in Martin County, Florida, since 2014. There, he works for Pratt and Whitney and its affiliates in research and development on airplane engines.

While Sosa was driving in Martin County, in November 2014, a Martin County Sheriff's deputy pulled him over for a routine traffic stop. During the encounter, the deputy reviewed Sosa's driver's license. After running Sosa's name through the Department's computer system, the deputy learned that an outstanding warrant for a David Sosa had been issued out of Harris County, Texas, in connection with that David Sosa's conviction for selling crack cocaine in 1992. The warrant set forth identifying characteristics for the wanted David Sosa, including his date of birth, height, weight, tattoo information (he had at least one), and other details. Plaintiff-Appellant Sosa pointed out to the officer that his own date of birth, height, and weight—a 40-pound difference between himself and the wanted David Sosa

4

existed—did not match the information for the wanted Sosa and that, unlike the wanted Sosa, he had no tattoos. The deputies arrested Sosa, anyway, and took him to the station.

There, they fingerprinted and detained him. Sosa told two Martin County jailers that he was not the wanted Sosa and explained that identifiers like date of birth differed between the two. After about three hours, a deputy determined that Sosa was not the wanted Sosa and released him.

But no one created a file or otherwise documented that Sosa was not the wanted Sosa. Nor did the Sheriff's Department have any system to prevent Sosa's future mistaken arrest on the wanted Sosa's warrant.

So perhaps not that surprisingly, Sosa had a similar misadventure not long after his 2014 incident. On April 20, 2018, a different deputy of the Martin County Sheriff's Department, Deputy Killough, pulled Sosa over for a traffic stop. Sosa provided Killough with his license, and when Killough ran it, he discovered the open warrant for the wanted Sosa. Sosa explained that he was not the wanted Sosa and told Killough he had previously been incorrectly arrested on that warrant and released when deputies realized the error. Sosa also noted that he and the wanted Sosa did not share the same birthdate, Social Security number, or other identifying information.

But Killough arrested Sosa and impounded his truck, anyway. When Killough took Sosa to the Martin County jail, Sosa "repeatedly explained to many Martin County employees . . . that his date of birth and other identifying information was different than the information on the warrant for the wanted . . . Sosa." In particular, Sosa so advised Deputy Sanchez and some other Martin County deputies in the booking area. They wrote down Sosa's information and told him they would follow up on the matter.

The next day, Sosa appeared by video before a magistrate judge. Though Sosa attempted to explain the mistaken identity, "several Martin County jailers threatened him and told him not to talk to the judge during his hearing." As a result, Sosa believed it was a crime to talk to the judge.

Finally, on April 23, deputies fingerprinted Sosa and then released him at about 3:00 p.m. In the meantime, he had missed work and then had to pay to retrieve his truck from impoundment.

Though the Sheriff's Department twice arrested and detained Sosa in error on the wanted Sosa's Texas warrant, the Sheriff's Department still created no file or other documentation to prevent the same thing from happening yet again.

Sosa had enough, and he filed suit against Martin County and the individual deputies. In his Amended Complaint, he brought a single count under 42 U.S.C. § 1983 for violations of his constitutional rights. The claim asserted that Martin

6

County, the Sheriff's Department, and the individual deputies violated Sosa's Fourth and Fourteenth Amendment rights by arresting and detaining him without probable cause or reasonable suspicion. It also alleged that the Sheriff and the County lacked adequate written policies and failed to train and supervise the deputies properly concerning arrests on outstanding warrants.

Sosa's complaint sought injunctive relief precluding the Martin County Sheriff's Department from arresting and detaining Sosa on the wanted Sosa's warrant, requiring the Sheriff and the County to maintain a file on Sosa as it relates to the wanted Sosa's warrant, and directing the Sheriff and the County to implement policies and train employees to avoid arresting and detaining individuals who are not wanted but who have the same names as those for whom a warrant is outstanding. The complaint also demanded compensatory and punitive damages and attorney's fees and costs.

Besides that, Sosa indicated his intentions to seek to represent and certify two classes: (1) a class of all David Sosas who are not the wanted Sosa and (2) a class of all "individuals falsely arrested or detained on warrants," where the person arrested or detained, or both, was not the person identified in the outstanding warrant.

Martin County moved to dismiss and separately, the Sheriff, Killough, and Sanchez filed their own motion to dismiss. The County first asserted that it could

7

not be held responsible for the Sheriff's actions. In the alternative, it, along with the Sheriff, contended Sosa failed to make out a *Monell* claim because he did not establish that they had a policy or custom that caused the deprivation of his rights. Deputies Killough and Sanchez asserted that they were entitled to qualified immunity.

The district court granted the motions to dismiss. It concluded that the deputies did not violate Sosa's constitutional rights with either their arrest or detention of Sosa, so it did not reach the question of qualified immunity on either issue. As for Sosa's *Monell* claim against Martin County and the Sheriff in his official capacity, the court determined that Sosa could not succeed on it because he failed to show that the deputies had violated his constitutional rights.

Sosa now appeals.

## II.

We review *de novo* an order dismissing a case under Rule 12(b)(6), Fed. R. Civ. P., for failure to state a claim. *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012). In so doing, for purposes of our analysis, we accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Id.* To survive a motion to dismiss, the complaint must include enough factual matter "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

**III.**

We begin with the false-arrest and overdetention claims. As we have noted, the deputies assert qualified-immunity defenses to each.

**A. The Doctrine of Qualified Immunity**

Qualified immunity exists in part "to prevent public officials from being intimidated—by the threat of lawsuits . . . —from doing their jobs." *Foy v. Holston*, 94 F.3d 1528, 1534 (11th Cir. 1996). In the course of their jobs, officers must sometimes rely on imperfect information to make quick decisions. *See, e.g., Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Nevertheless, those decisions must be reasonable to fall within qualified immunity's ambit. *See id.* at 396; *see also Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014). So when we consider whether an officer is entitled to qualified immunity, we balance "the need to hold [officers] accountable when they exercise power irresponsibly and the need to shield [them] from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and quotation marks omitted). But it does not extend to an officer who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of

the [plaintiff]." *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982) (citation and quotation marks omitted) (alteration in original).

To invoke qualified immunity, a public official must first establish that he was acting within the scope of his discretionary authority when the challenged action occurred. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). When we speak of "discretionary authority," we mean all actions the official took (1) in performing his duties and (2) in the scope of his authority. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). Here, the deputies satisfied this requirement, as they arrested and detained Sosa while performing their official duties.

Because the deputies were acting within the scope of their discretionary authority, the burden shifts to Sosa to demonstrate that qualified immunity is inappropriate. *See id.* To do that, the factual allegations in Sosa's complaint must establish two things: (1) the deputies violated his constitutional rights not to be arrested and not to be detained for three days and nights on a warrant for a different David Sosa; and (2) those rights were "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of the deputies' actions, so as to have provided fair notice to the deputies that their actions violated Sosa's rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 555 U.S. 223; *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016).

We separately consider in Section III.B. whether the deputies are entitled to qualified immunity on Sosa's false-arrest claim and in Section III.C on his overdetention claim.

## B.    The deputies are entitled to qualified immunity on Sosa's false-arrest claim

As relevant here, the Fourth Amendment, incorporated to apply to the States through the Fourteenth Amendment, *Baker v. McCollan*, 443 U.S. 137, 142 (1979), protects individuals against unreasonable seizures, U.S. Const. amend. IV.  Because they involve unreasonable seizures, constitutional claims for false arrest against state public officials arise under the Fourth Amendment.  *See Carter v. Butts Cnty.*, 821 F.3d 1310, 1319 (11th Cir. 2016) ("An arrest is a seizure[.]").

An arrest complies with the Fourth Amendment if it is supported by probable cause.  *Barnett v. MacArthur*, 956 F.3d 1291, 1296-97 (11th Cir. 2020).  But when the arresting officer raises a qualified-immunity defense, a § 1983 plaintiff must allege sufficient facts to establish that the deputies did not have even arguable probable cause to arrest him.  *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1293-94 (11th Cir. 2018).  Probable cause for an arrest exists when the totality of the circumstances renders the arrest objectively reasonable.  *Barnett*, 956 F.3d at 1296-97.  And "a probability or substantial chance of criminal activity, not an actual showing of such activity," satisfies that standard.  *D.C. v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 586 (2018) (citation and quotation marks omitted).  As for arguable

11

probable cause, that exists when "reasonable officers in the same circumstances and possessing the same knowledge" as the arresting officer could have thought there was probable cause to arrest the plaintiff. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) (citation and quotation marks omitted).

Where, as here, a warrant has issued, that warrant represents a determination of probable cause. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984). But because the warrant involved here was for a different David Sosa than Plaintiff-Appellant Sosa, we must engage in an extra layer of analysis to determine whether Deputy Killough's arrest of Sosa on the wanted Sosa's warrant violated Sosa's Fourth Amendment rights. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1345 (11th Cir. 2002).

When a valid warrant underlies an arrest, but law-enforcement officers mistakenly arrest the wrong person because of a misidentification, a "reasonable mistake" standard governs the constitutionality of the arrest. *Id.* at 1345-46. To assess whether a misidentification mistake is "reasonable," we consider the totality of the circumstances concerning the arrest. *Id.* at 1347.

*Rodriguez* aptly illustrates how we have applied this test in practice. There, Joe John Rodriguez was riding as a passenger in a car that an officer pulled over for a traffic stop. *Id.* at 1343. During the stop, the officer asked Rodriguez for identification. *Id.* Rodriguez responded with more than ten pieces of identification,

including his Florida driver's license, birth certificate, military-discharge papers, Social Security card, credit card, and V.A. patient-data card. *Id.* Upon receiving these items, the officer ran a check on Rodriguez's driver's license information. *Id.* at 1344. At some point, he was advised that three warrants existed for a Victor Heredia who used the alias "Joe Rodriguez." *Id.* Among these, a six-year-old warrant out of St. Johns County, Florida, sought Heredia for driver's license-related charges and possession of cocaine. *Id.*; *see also id.* at 1344 nn.6 & 7. After considering the warrant's identifying information for Heredia, the officer believed Rodriguez was Heredia and arrested him. *Id.* at 1345.

We held the officer's misidentification of Rodriguez to be a "reasonable mistake," though we recognized that merely matching the name on the warrant with the arrestee's name, with nothing more, would not have been reasonable. *See id.* at 1346-48. First, we found that "four critical" identifiers for both men were the same: name, sex, age, and race. *Id.* at 1347. We also observed that "[s]ignificant other information was similar," including similar Social Security numbers, addresses in neighboring Florida towns, the same birth state, and similarities in tattoos. *Id.* And even with respect to the different towns for each man's address, we thought "it would not be surprising" for a person who uses an alias to also use a false address and birthdate. *Id.* at 1347 n.13 (citation and internal quotation marks omitted). We did not find differences in eye color or in scars to be meaningful, considering the

13

availability of contact lenses and cosmetic surgery. *Id.* at 1347 n.14. And we were similarly unimpressed with weight differences, since weight varies, "especially over six years." *Id.* In contrast, we found only one material difference in the identifying information for the two men: Rodriguez said he was 5'11", and Heredia was 5'6". *Id.*

But considering all the other similarities and the officer's on-the-fly assessment of Rodriguez's height, we concluded that the officer's arrest of Rodriguez was "a reasonable mistake." *Id.* at 1347-49. As we explained, "[t]he question is not whether the police could have done more; but whether they did just enough." *Id*. at 1347 n.15. And "small difference[s]" between the person arrested and the person listed on the warrant—especially ones that can easily be explained— are not enough to render an arrest on a valid warrant unreasonable. *Id.* at 1347-48.

Applying *Rodriguez* here, we conclude that Killough's mistaken arrest of Sosa on the wanted Sosa's warrant was "reasonable" within the bounds of the Fourth Amendment. We begin by recognizing that the arrest occurred during a roadside stop, which limited Killough's ability to investigate Sosa's claims of mistaken identity. *See id.* at 1347 n.15 ("Trials of guilt or innocence cannot be undertaken by police officers on the side of the road in the middle of the night before an officer can effect a lawful arrest pursuant to a valid warrant."); *cf. Tillman v. Coley*, 886 F.2d 317, 321 (11th Cir. 1989) ("This is not a case where time was of the essence in

making the arrest.  [The defendant] had at least three months to resolve his doubts about [the plaintiff's] identity." (citation omitted)).

Next, we look at the similarities and discrepancies between the warrant information and Sosa's descriptive information.  Sosa's name and sex were the same as the wanted Sosa's.  Sosa also did not allege any difference between his and the wanted Sosa's race.  And while Sosa alleged that the two men's birthdates were "entirely different," [3] he did not assert that there was any significant difference in the men's ages. We have previously described the name, sex, race, and age characteristics as "critical."  *Rodriguez*, 280 F.3d at 1347.  As for differences, Sosa identified a forty-pound weight difference and the fact that the wanted Sosa had a tattoo while Sosa had none.  We also note that the warrant was out of Texas, while Sosa was a Florida resident.

---

[3] Sosa's First Amended Complaint averred that, in contrast to the wanted Sosa, Sosa "had an entirely different date of birth, substantial height difference, . . . and other identifying characteristics easily viewed on the warrant, [Sosa]'s driver license and [Sosa] himself."  These allegations are conclusory and do not impart meaningful factual information that allows us to evaluate whether, in fact, the differences between the two men's dates of birth, heights, and "other identifying characteristics" not otherwise specified would qualify as material under the reasonable-mistake test.  *Iqbal*, 556 U.S. at 578-79 (a plaintiff "does not unlock the doors of discovery . . . armed with nothing more than conclusions").  For instance, though the two birthdates are "entirely different," we do not know whether that means a one-year or a 25-year difference between the ages of Sosa and the wanted Sosa exist.  Nor do we know whether the height difference between the two was three inches, five inches (as in *Rodriguez*), or a foot, so we cannot assess whether that difference is legally "substantial," for purposes of our analysis.  For that reason, these allegations "are not entitled to the assumption of truth" that generally attaches to factual allegations in a complaint on a motion to dismiss, and we cannot consider them.  *Id*. at 679.

These differences Sosa alleged were not material, viewed in the totality of the circumstances. Significantly, 26 years had passed between when Harris County issued the warrant for the wanted Sosa and when Sosa was arrested. That figures heavily into our analysis. We have previously observed that weight is "easily variable," particularly over a number of years, so that is a difference of not "much importance." *Rodriguez*, 280 F.3d at 1347 n.14.

We have also characterized as a difference of not "much importance," in view of the passage of time, an arrestee's lack of a scar where the wanted individual had one, since cosmetic surgery allows for changes in skin appearance. *Id.* Tattoos can likewise be removed using similar procedures. And here, not only had 26 years elapsed, but also Sosa did not allege the location of the tattoo, so we do not know whether the area where the tattoo was supposed to have been was even readily observable at the time of the arrest. Finally, the passage of time also renders insignificant the fact that the warrant issued out of Texas, while Sosa lived in Florida. Sosa easily could have relocated from Texas to Florida in the intervening 26 years. When we consider all these circumstances, keeping in mind that that Killough compared the warrant information to Sosa's information on the side of the road during a traffic stop, we must conclude that his error in arresting Sosa on the wanted Sosa's warrant was not unreasonable by Fourth Amendment standards.

16

**C.    The deputies are not entitled to qualified immunity on Sosa's overdetention claim**

> *1.    The individual deputies violated Sosa's Fourteenth Amendment right to be free from overdetention when they did not act for three days to investigate and follow up on information indicating that Sosa was not the wanted Sosa*

We start by describing the nature of Sosa's overdetention claim. Overdetention means continued detention after entitlement to release, even though probable cause supported the charge underlying the original detention. *Alcocer v. Mills*, 906 F.3d 944, 953 (11th Cir. 2018).

Claims of overdetention under § 1983 can arise under the Fourth Amendment's right to be free from detention without probable cause or under the Fourteenth Amendment's substantive due-process right to be free from continued detention after it should have been known that the detainee was entitled to release. *See id.* at 952; *see also Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993), *opinion modified on reh'g on other grounds*, 15 F.3d 1022 (11th Cir. 1994). Here, the claim arises under the Fourteenth Amendment. That is so because Sosa asserts that even if a valid warrant supported his arrest, he had the right to be free from continued detention once the deputies knew there was a serious risk Sosa was misidentified as the target of the warrant but continued to detain him, anyway. *See Baker*, 443 U.S. at 145.

Proving a violation requires a plaintiff to establish that the defendant was deliberately indifferent to his due-process rights. *Alcocer*, 906 F.3d at 953. To satisfy that standard, a plaintiff must show three things: (1) the defendant's subjective knowledge of a risk of serious harm in the form of continued detention even after the plaintiff had a right to be released; (2) disregard of that risk; and (3) disregard by conduct that is more than mere negligence. *Id.*

*Cannon* provides a good example of how the standard works in practice. There, a deputy encountered Mary Cannon, then known as Mary Rene Parrott, at a rest stop in Georgia. 1 F.3d at 1560. When he ran her name through the National Crime Information Center ("NCIC"), he learned that a Mary E. Mann, a.k.a. Mary E. Parrott, was wanted by Kentucky for crimes. *Id.* The deputy took Parrott to jail, despite her repeated protests that she was not Mann. *Id.* At the jail, Deputy Collins completed Parrott's arrest report. *Id.* He stated that he identified Parrott as Mann based on a match in Social Security numbers and birthdates, as well as on the fact that Mann used the alias Mary E. Parrott. *Id.* And he also testified that had the Social Security numbers and birthdates not matched, Cannon would not have been arrested and held in jail. *Id.*

As it turned out, though, the Social Security numbers and dates of birth did not match. *Id.* Not only that, but there was a four-inch height difference between the two women, one had brown eyes and the other blue, and Parrott was twelve years

18

younger than Mann. *Id.* Despite these differences, the arrest report for Parrott reflected Mann's identification information. *Id.* Collins initially testified that he had filled out the arrest report with information he had obtained directly from Parrott. *Id.* But since the information in the arrest report matched the information in the NCIC report (except for the Social Security number, which matched the Social Security number of another individual listed on the NCIC report for Mann), the evidence suggested that Collins simply copied the NCIC report when he prepared the arrest report. *Id.* Collins also attested to a local judge that he believed Parrott to be the wanted Mann, so the judge issued a fugitive warrant for Parrott's arrest. *Id.* at 1561. Parrott spent a total of seven days in the Georgia jail before she was transferred to Kentucky, where she was promptly released when authorities there discovered she was not Mann. *Id.*

She sued Collins under § 1983, asserting a Fourteenth Amendment overdetention claim. *See id.* Following a trial, a jury returned a verdict for Parrott. *Id.* But the district court entered a judgment for Collins notwithstanding the verdict. *Id.* We reversed. *See id.* at 1566.

In applying the Fourteenth Amendment deliberate-indifference standard, we concluded, based on the facts we have described above, that "the jury finding that Collins acted with deliberate indifference to [Parrott's] due process rights [was] supported by substantial evidence." *Id*. at 1563. As we explained, "Collins' failure

19

to take any steps to identify [Parrott] as the wanted fugitive was sufficient to raise a question of fact as to his deliberate indifference toward [Parrott's] due process rights." *Id*. at 1564.  In particular, we took issue with Collins's completion of the arrest procedure and his obtaining of a fugitive warrant without making any effort to identify Parrott as Mann.  *Id.*  We said that Parrott had a "constitutional right to be free from continued detention after it was or should have been known that [she] was entitled to release . . . ." *Id.* at 1563.  Indeed, "numerous courts have [also] reached the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement 'after it was or should have been known that the detainee was entitled to release.'" *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (quoting *Cannon*, 1 F.3d at 1563, and collecting cases).

We think Sosa has alleged sufficient facts to bring his case squarely within the ambit of *Cannon*.  Like Parrott, Sosa has alleged that he repeatedly advised deputies, including those at the jail on the date of his arrest, that he was not the wanted person.  Notably, he also informed them that he had previously been mistakenly arrested by the Martin County Sheriff's Department on the wanted Sosa's warrant and that he and the wanted Sosa had different birthdates, Social Security numbers, and other identifying information, including a difference in height, weight, and tattoos (the wanted Sosa had one, while Sosa did not).  In fact, Sosa asserted that on that same day, he "explained this in detail to a Martin County

20

deputy named Sanchez as well as some other Martin County jailers and employees in the booking area, who took down his information and claimed they would look into the matter."

In assessing these allegations at the motion-to-dismiss stage, we must make every reasonable inference from the alleged facts in favor of the plaintiff. And when we do that here, these allegations sufficiently establish that Sanchez and other deputies at the jail had enough information to know (1) that a substantial possibility existed that Sosa was not the wanted Sosa and (2) that they had the means readily available to rapidly confirm Sosa's identity. Yet they took no action for three days and nights while Sosa sat in jail. Finally, after Sosa spent three nights in jail, an unnamed deputy followed up on the information Sosa had provided them. And when an unidentified deputy did so by taking Sosa's fingerprints—a standard police tool long used by every U.S. police force—that deputy was easily and quickly able to confirm that Sosa was not the wanted Sosa.[4]

Under these circumstances, Sanchez's and the other deputies' failure to act for three days and nights to verify that Sosa was the wanted Sosa is reminiscent of

---

[4] U.S. law enforcement has commonly used fingerprints as a means of identification since the first half of the twentieth century. Kenneth R. Moses et al., *Automated Fingerprint Identification System (AFIS), in* The Fingerprint Sourcebook 6-1, 6-3–6-4, https://www.ojp.gov/pdffiles1/nij/225326.pdf (last visited Sept. 20, 2021). And the Automated Fingerprint Identification System ("AFIS"), which electronically digitizes, stores, and analyzes fingerprints, has been operational since the 1980s. *Id.* at 6-9. Standard-print inquiries (as from fingerprints taken during law-enforcement processing) under AFIS "can often return a search of a million records in under a minute." *Id.* at 6-10.

Collins's failure to take any steps to identify Parrott as Mann in *Cannon*. We said in *Cannon* that "Collins' failure to take any steps to identify [Parrott] as the wanted fugitive was sufficient to raise a question of fact as to his deliberate indifference toward [Parrott's] due process rights." *Id.* at 1564. Sanchez's and the other deputies' failure for three days and nights to undertake any steps to confirm Sosa's identity as the wanted Sosa, despite having information indicating he was not, is no less sufficient to support Sosa's claim that these defendants were deliberately indifferent towards Sosa's due-process rights.

Defendants-Appellees and the Dissent contend that *Baker*, 443 U.S. 137, requires a different answer. We disagree.

In *Baker*, Leonard McCollan obtained a duplicate of his brother Linnie's driver's license. *Id.* at 140. Leonard's[5] version of the license was the same as Linnie's in every way, except that it bore a picture of Leonard instead of Linnie. *Id.* So when Leonard was arrested on narcotics charges, he was booked as Linnie. *Id.* at 140-41. Leonard also signed documents in conjunction with his arrest and was released on bail as Linnie. *Id.* at 141.

About two months after Leonard's bondsman procured a warrant out of Potter County, Texas, for the arrest of "Linnie Carl McCollan," who must have violated his bond conditions, a police officer pulled over Linnie for a traffic stop in Dallas,

---

[5] To avoid confusion, we use the McCollans' first names in our discussion of *Baker*.

22

Texas. *Id.* The police officer arrested Linnie on Leonard's (in the name of Linnie) warrant. *Id.* Linnie was then transferred to the custody of the deputies in the county from where the warrant issued. *Id.* He remained there for three nights, until officials, in comparing Linnie's appearance to the file photo of the wanted person, realized that Linnie was not that man. *Id.* Linnie sued the county sheriff under § 1983, alleging that the county's custody of him violated his Fourteenth Amendment rights. *Id.* The Supreme Court disagreed. *Id.* at 146-47.

First, it assumed that, "depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" *Id.* at 145. But after acknowledging that, it said it was "quite certain that a detention of three days *over a New Year's weekend* does not and could not amount to such deprivation." *Id.* (emphasis added).

Our colleague reads this sentence to stand for the proposition that, no matter the circumstances, three days' detention can never amount to an unconstitutional deprivation of liberty without due process of law, as long as the person was detained on a valid warrant. We respectfully disagree for three reasons.

First, in its assumption for purposes of its analysis, the Court linked the acceptable period of detention to the "procedures the State affords defendants

23

following arrest and prior to detention." *Id.* at 145. In contrast to establishing a bright-line rule that a three-day detention can never amount to an unlawful liberty deprivation, this qualification indicates that the acceptability of any period of detention depends at least in part on process and circumstances. *Lee v. City of Los Angeles*, 250 F.3d 668, 684 (9th Cir. 2001) (explaining that the language from *Baker* stating that "after the lapse of a certain amount of time," "depending on what procedures the State affords defendant [] following arrest and prior to trial," means that "the mistaken incarceration of an individual in other circumstances may violate his or her right to due process"). In *Lee*, for example, after the Ninth Circuit applied these considerations to the case before it, it held that a plaintiff who had been mistakenly detained for *one* day on a facially valid warrant for another person with a similar name stated a due-process claim under the Fourteenth Amendment. *See id.*

Second (and relatedly), "the 'holding' of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision." *United States v. Caraballo-Martinez*, 866 F.3d 1233, 1244 (11th Cir. 2017); *see also Edwards v. Prim, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.") (collecting cases). *Baker*'s facts and circumstances were not broad enough to cover Sosa's situation.

In *Baker*, the Supreme Court explained the basis for its decision as follows:

24

> Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. . . . *The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.*

*Baker*, 443 U.S. at 145-46 (emphasis added).

Claims based on "a defense such as lack of requisite intent" or the specific type of mistaken-identity claim Linnie made differ in a material way from Sosa's claim of mistaken identity:  the kinds of cases *Baker* described might ultimately require a jury to resolve their claims of innocence, as the quotation above expressly recognizes.  After all, the state in *Baker* had been duped and was under the (mistaken) impression that it was, in fact, looking for Linnie McCollan because his brother had framed him.  Those kinds of circumstances could understandably call for a jury to make factual findings about who actually committed the charged crime.  A defense of lack of intent also presents a jury question.[6]

---

[6] For this reason (among others), the Dissent's reliance on *Pickens v. Hollowell*, 59 F.3d 1203 (11th Cir. 1995), Dissent at 58-59, is also misplaced.  There, Pickens was arrested on five-year-old bad-check charges for checks written on her accounts.  *Pickens*, 59 F.3d at 1205.  She told the arresting officer that she had reported the checks stolen and had filed forgery charges and that she thought the statute of limitations on the offenses was two years.  *Id.*  Nevertheless, the officer arrested her, and she was held in the jail for several hours before being released on a bond.  *Id.*  The district attorney ultimately dismissed the charges because the statute of limitations had run.  *Id.*  Obviously, *Pickens* was not a straight-forward misidentification case like Sosa's.  First, law-enforcement officials were, in fact, looking for Pickens.  And second, Pickens's case required some police investigation to substantiate Pickens's factual defense, and the district attorney was the one qualified to make the decision about the statute-of-limitations defense.  Contrary to the Dissent's suggestion, *see* Dissent at 59 n.2, this material difference between the facts of *Pickens*

But in Sosa's case, no jury even conceivably should have been necessary because it was a straight-forward case of mistaken identity: Houston County was not looking for David Sosa but for the wanted Sosa, and a simple fingerprint comparison would (and did, as it had in 2014 as well[7]) indisputably resolve Sosa's claim. Indeed, it is doubtful that a one-minute fingerprint comparison that is standard upon jail processing could even fairly be characterized as an "investigat[ion]" of a "claim of innocence," *Baker*, 443 U.S. at 145-46. *See Investigate*, https://www.merriam-webster.com/dictionary/investigate (last visited Sept. 20, 2021) ("to observe or study *by close examination and systematic inquiry*") (emphasis added). The Dissent's overly broad reading of *Baker* to somehow equate Sosa's situation with those that could understandably require a true investigation and a jury trial to be resolved, *see* Dissent at 48-50, is misplaced.

Third, the Supreme Court was careful to point out that the detention period at issue in *Baker* consisted of "three days over a New Year's weekend." Not "three

---

and the facts here—*Pickens* could have required a trial on the facts, or at least a legal determination on the statute-of-limitations defense before resolution, while Sosa's case required a one-minute standard-practice fingerprint comparison for resolution—does matter to understanding what we said about *Baker* in *Pickens*. Our point in *Pickens* was that *Baker* did not require the state to conduct a full-blown factual investigation or legal evaluation before arresting *Pickens* (*Pickens* wasn't even an overdetention case). But no full-blown factual investigation or legal evaluation was necessary in Sosa's case because a simple fingerprint comparison would have revealed the misidentification instantly.

[7] The Dissent makes much of the fact that Sosa's release the first time he was misidentified took three hours. *See* Dissent at 50. It misses the point: while it may have taken three hours from the time Sosa was wrongly arrested the first time until he was released, Sosa does not allege—and it makes no sense to suggest—that for the entire period he was in custody, deputies were running his fingerprints. And in any case, bigger point is that it did not require three days.

26

days." Not even "three days over a weekend." But "three days over a New Year's weekend." This suggests something significant about the fact that the three-day period was a long holiday weekend.

We are not the first to reach this conclusion. In *Patton v. Przybylski*, 822 F.2d 697, 700 (7th Cir. 1987), the Seventh Circuit construed *Baker* not to count holidays or weekends in identifying days of detention.

So what is different about holiday weekends than other days of the year? New Year's weekend is known, among other things, for being a period when, traditionally, less essential public services are not fully staffed,[8] so it may not have been reasonable under those circumstances to expect officers operating in a lightly staffed jail[9] to leave the jail to, or find an officer outside the jail to, physically locate

---

[8] The Dissent argues that more officers, not fewer, would be available during the New Year's weekend to investigate arrestees' claims of misidentification. *See* Dissent at 51-53. In support, it cites articles reporting that, because of post-9/11 antiterrorism efforts, "shoppers and travelers will see more police and tougher security checks in public places"; police make more DUI traffic stops during New Year's weekend; and law enforcement increases patrols to stop purse snatchings, robberies and car thefts. *See id.* Setting aside the fact that Linnie's arrest happened in 1972—twelve years before the first of these articles was published, twenty-nine years before 9/11 occurred, and eight years before even MADD was formed, in part to put pressure on government to increase sober-driving enforcement—that all these officers are on the road and patrolling shopping malls and neighborhoods only makes the point that they are not at the jail on New Year's weekend. Plus, the upshot of the Dissent's argument is that the Supreme Court emphasized New Year's weekend in *Baker* because it thought that the jail would be more heavily staffed and officers were more likely to discover their error over the three-day New Year's weekend. That makes no sense in the context of the sentence quoted from the Court's opinion.

[9] Notwithstanding the Dissent's unsupported supposition that in 1972, there would have been more officers "at the jail to process ["scofflaws"]," Dissent at 53, the Supreme Court's emphasis on the fact that Linnie's detention over "New Year's weekend" did not violate the Fourteenth Amendment under the circumstances in *Baker* clearly supports the notion that the Supreme Court did not think that jails were more heavily staffed during that holiday period.

27

the file on Leonard, review it, compare the photograph of the wanted individual with Linnie, and recognize that the two were different people. In other words, the nature of the particular three days over which Linnie was detained factored into the Court's consideration of the process he was due during that period.[10]

Application of these principles here shows *Baker* cannot save Defendants-Appellees from the rule we announced in *Cannon*. Besides the overbreadth problem we described in our second point above (*Baker* by its reasoning does not apply when, as here, under no circumstances would the type of misidentification that happened to Sosa have required a jury trial), Sosa was detained for three days. And though two of those days fell over the weekend, it was not a holiday weekend like it was in *Baker*. At the motion-to-dismiss stage, there are no allegations (and, of course, no

---

[10] Our second (the nature of the allegation of innocence) and third (the difference between New Year's weekend and three nonholiday days that include a regular weekend) points above independently render irrelevant one of the Dissent's two alleged "key differences" between Sosa's case and *Cannon*, *see* Dissent at 62: "that Parrott was held for seven days and not for three." The other alleged "key difference"—that we "didn't say [in *Cannon*] that Parrott was arrested on a facially valid warrant," *id.*—is likewise immaterial. First, we have held that an arrestee's name matching an NCIC wanted report as in *Cannon* establishes probable cause. *See United States v. Roper*, 702 F.2d 984, 989 (11th Cir. 1983) ("NCIC printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause.") (citation and quotation marks omitted). And second, even other Circuits have recognized that *Cannon* stands for the proposition that "a detainee has 'a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.'" *Lee*, 250 F.3d at 683 (quoting *Cannon*, 1 F.3d at 1563); *see also Russo v. City of Bridgeport*, 479 F.3d 196, 207 (2d Cir. 2007) ("Following *Baker*, the Eleventh Circuit recognized a Fourteenth Amendment due process right 'to be free from continued detention after it was or should have been known that the detainee was entitled to release.'") (quoting *Cannon*, 1 F.3d at 1563); *Doe v. Att'y Gen. of U.S.*, 659 F.3d 266, 273 (3d Cir. 2011) (noting that *Cannon* held "that a detainee has a constitutional right to be released from confinement 'after it was or should have been known that [he] was entitled to release'") (quoting *Cannon*, 1 F.3d at 1563); *Davis v. Hall*, 375 F.3d 703, 714 (8th Cir. 2004) (same).

evidence) that the Martin County Sheriff's Department was so lightly staffed over the April weekend Sosa spent in jail as to make it reasonable for Sanchez or any of the other officers who told Sosa they would look into the alleged mistaken identity to take no steps to confirm Sosa's identity for three days. To the contrary, Sosa alleged that during his stay, several deputies, including Sanchez, told Sosa that they would look into the misidentification issue.

This is even more the case when we compare Sosa's circumstances to those of Linnie. In *Baker*, Linnie was arrested within two months of the issuance of the warrant by another county in his same state, and his brother had set him up so the state would think it was looking for Linnie. That is a very different situation from the one we have here, where Sosa was arrested 26 years after the warrant issued, in a state halfway across the country from where the warrant issued, and no one made any effort to fool the detaining officers into thinking Sosa was the wanted Sosa. A 26-year-old warrant issued five states and almost 1,400 miles away from the arrest location—particularly for an individual with such a common name as David Sosa[11]—inherently raises more identity questions than a two-month-old warrant

---

[11] Sosa's complaint alleges that LinkedIn includes more than 800 professional listings for people named "David Sosa" and thousands of people named "David Sosa" have lived in or visited the United States during the period relevant to Sosa's lawsuit.

issued in the much less common name of Linnie McCollan, from the same state as the arrest location.[12]

Not only that, but to state the obvious, 2018, when Sosa was detained, was not 1972, when Linnie was detained. The technology law-enforcement officers used every day in 2018 remained entirely the stuff of science fiction in 1972.[13] Indeed, when *Baker* was decided—before AFIS—to the extent Linnie's case was going to be resolved short of a jury trial, it necessarily would have demanded at least a few days to sort out for whom the state was truly looking. After all, the state itself was under the mistaken impression that it was looking for Linnie. And even assuming a simple fingerprint or photograph comparison necessarily would have been enough to resolve the problem, a fingerprint comparison would have required prints to be copied, physically mailed or otherwise messengered, and compared by a human being with Leonard's prints—a process that could easily take three days, even if all three days were workdays.

Similarly, in 1972, comparing Linnie's appearance to a photograph of his wanted brother could not have been done from the jail (as a fingerprint comparison

---

[12] The Dissent's citation of *Rodriguez* in its discussion of the overdetention claim is inapposite. *See* Dissent at 54. *Rodriguez* involved no claim of overdetention.

[13] Many Trekkies have compiled lists of such technology. *See*, *e.g.*, Mun Keat Looi, "Here are all the technologies Star Trek accurately predicted," *Quartz*, Sept. 8, 2016, https://qz.com/766 831/star-trek-real-life-technology/ (listing, among many other technologies, flip communicators (and wearable badge communicators), tablet computers, biometric data tracking for health and verifying identity, teleconferencing, Bluetooth headsets, portable memory, Google Glass, GPS, real-time universal translators).

could have been in 2018) if the file were not located there—and presumably, it wouldn't have been.[14]  In that case, comparing Linnie's appearance to the file photo would have required retrieval of the physical case file, wherever that may have been located (perhaps a detective's office; perhaps a central filing room; perhaps elsewhere); finding within that paper file a photograph for comparison; and then comparing the detainee's face with that of the person intended to have been arrested. That, too, would have been a process that required some time.  Indeed, hunting down the file alone would have taken time.

In contrast, in 2018, fingerprinting was standard practice upon booking.  *See*, *e.g.*, *Police Booking Procedure*, FindLaw, https://www.findlaw.com/criminal/criminal-procedure/booking.html (last visited Sept. 20, 2021).  And as we have noted, law enforcement regularly ran fingerprints through AFIS or compared them with a single set of prints almost instantaneously, with the push of a button or two. In fact, during Sosa's first Martin County arrest on the same David Sosa warrant

---

[14] The Dissent argues that the file must have been at the jail because "the lower court faulted the *Baker* sheriff for not, 'immediately upon [Linnie's] arrival in Amarillo,' comparing him 'with the file photograph and the fingerprints of the wanted man.'"  Dissent at 55-56.  But *Baker* reports the old Fifth Circuit's discussion as follows:  "Noting that the error would have been discovered if Potter County officials . . . had immediately upon respondent's arrival in Amarillo compared him with the file photograph and fingerprints of the wanted man, the Court of Appeals determined that a jury could reasonably conclude that the sheriff had behaved unreasonably in failing to institute such measures." *Baker*, 443 U.S. at 142.  This does not in any way suggest that the case file was at the jail.  Rather, it indicates only that our predecessor Court thought that the sheriff's office that booked Leonard, as a standard operating procedure, should have compared his case-file photograph to that of Linnie as a first order of business, regardless of where the sheriff's office happened to keep the case file.

three-and-half years earlier, Sosa was correctly identified and released within three hours because of the fingerprint-comparison process. Under these circumstances, where the simple process of comparing prints would have—and indeed, ultimately did—immediately reveal that Sosa was not the wanted Sosa, officers who have reason to know a straight-up mistaken identity may have occurred cannot do nothing for three days.

In and of themselves, and as in the cases the Seventh and Ninth Circuits decided, these reasons explain why *Baker* cannot immunize Defendants-Appellees. But we also note that *Baker* involved facts distinguishable in another way as well. As Justice Blackmun explained in his concurrence (and unlike here), the deputies who left Linnie in jail for days without checking into his claims at all were not named as defendants. *Baker*, 443 at 148 (Blackmun, J., concurring). Rather, the sheriff was the sole defendant. And he had not "turned a deaf ear to [Linnie's] protests." Rather, he had "checked the files and released [Linnie] as soon as [he] became aware of [Linnie's] claim." *Id.* Indeed, Justice Blackmun noted, "there [was] no indication that [the sheriff] was aware, or should have been aware, either of the likelihood of misidentification or of his subordinates' action[s]." *Id.* And of course, in the absence of personal participation or a causal connection between a supervisor's actions and the misdeeds of those she supervises, § 1983 does not allow for supervisors in their individual capacity to be held vicariously liable for the

32

unconstitutional acts or omissions of their subordinates.[15]  *Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019).

Justice Blackmun also observed that the Court's opinion did not "foreclose the possibility that a prisoner in [Linnie's] predicament might prove a due process violation by a sheriff who deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints."[16] *Baker*, 945 F.3d at 148 (Blackmun, concurring).  After all, and as we have noted, "[w]hatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."  *Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1207 (11th Cir. 2003).

Consistent with these reasons for why *Baker* does not govern Sosa's situation, we interpreted *Baker* in *Cannon* as not precluding a jury from finding that Parrott's Fourteenth Amendment rights were violated when Deputy Collins held Parrott for seven days without taking steps to identify her as the wanted fugitive, even though he could have easily and readily ruled her out just by obtaining information directly from Parrott (instead of from the NCIC report on Mann).[17]  *See* 1 F.3d at 1564.

---

[15] The Dissent compares Sanchez and the other detention deputies in Sosa's case with the sheriff in Linnie's case, Dissent at 47 ("Sosa's jailer, like Linnie's sheriff, didn't investigate the mistaken identity claim for three days").  But for the factual and legal reasons laid out above, this comparison is not correct.

[16] And this was before AFIS, *see supra* at n.4, was available.

[17] We also respectfully disagree with the Dissent's contention that our reading of *Baker* in *Douthit v. Jones*, 619 F.2d 527 (5th Cir. 1980), requires the conclusion that *Baker* precludes Sosa's

Sosa's case raises the same problem. He alleges that Sanchez and the other deputies at the jail did nothing to resolve the identity dispute for three days and nights while he sat in jail. And they did not act, even though Sosa repeatedly and insistently advised them of the Martin County Sheriff's Department's prior mistaken arrest of him on the same warrant and of the differences between himself and the wanted Sosa—and even though a quick, easy, and readily available comparison of Sosa's fingerprints to those of the wanted Sosa would have cleared up the entire problem immediately (as it ultimately did when an unidentified deputy finally did get around to printing Sosa and comparing his prints to the wanted Sosa's). So *Baker* does not allow for the conclusion that the deputies here did not violate Sosa's Fourteenth Amendment substantive-due-process right.

---

claim. *See* Dissent at 58. From *Douthit*, the Dissent plucks from the context of the opinion this sentence: "In *Baker* the [Supreme] Court held that the detention of an individual for three days on the basis of a valid arrest warrant despite his protestations of innocence did not amount to a deprivation of liberty without due process." *Id.* (quoting *Douthit*, 619 F.2d at 532). The two sentences in *Douthit* immediately following the quoted sentence from *Baker* say, "This case presents a substantially different factual context from Baker since Douthit has alleged that the defendants imprisoned him for thirty days beyond the sentence imposed upon him without a valid commitment order. Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process." *Douthit*, 619 F.2d at 532. That is the entirety of *Douthit*'s discussion of *Baker*. In other words, we had no occasion to analyze *Baker* because even a superficial reading of it revealed it could not possibly be applicable in *Douthit*.

2.    *Sosa's right to be free from prolonged detention without any effort by the holding deputies to resolve doubts about his identity was clearly established by* Cannon *at the time of the alleged violation.*

Because we conclude that Sosa sufficiently alleged that Sanchez and the other deputies at the jail violated his Fourteenth Amendment due-process right, we next consider whether that right was clearly established when the alleged violation occurred.

A right is clearly established when "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (cleaned up). So though the Supreme Court or we need not have held "the very action in question" to be unlawful, the unlawfulness of the action "must be apparent" under the law in existence at the time of the violation. *Id*. at 1312 (cleaned up).

We have recognized three ways in which a plaintiff can show that a constitutional right was clearly established at the time of the violation. *Keating v. City of Miami*, 598 F.3d 753, 766 (11th Cir. 2010). First, a plaintiff can point to "a materially similar" precedent. *Id.* (citation and quotation marks omitted). Second, he can turn to "a broader, clearly established principle [that] should control the novel facts" of the case under review. *Id.* (citation and quotation marks omitted). Or third, he can demonstrate that the officer's conduct "so obviously violates the Constitution that prior case law is unnecessary." *Id.* (cleaned up). In satisfying this burden to

prove his right was clearly established, the plaintiff must rely on "law as interpreted by the Supreme Court, the Eleventh Circuit, or [as relevant here] the Supreme Court of Florida." *Id.* (citation and quotation marks omitted).

Here, "a broader, clearly established principle . . . control[s] the novel facts." *See id.* As we have noted, *Cannon* held that the deputy's "failure [there] to take any steps to identify [the detained person] as the wanted fugitive was sufficient to raise a question of fact as to his deliberate indifference toward [the detained plaintiff's] due process rights." *Cannon*, 1 F.3d at 1564. Sosa has alleged the same situation here: despite knowing of the significant possibility that Sosa was not the wanted Sosa, Sanchez and other deputies took no action confirm Sosa's identity. So for three days and nights, Sosa remained in jail until finally, a different, unidentified deputy took Sosa's fingerprints and checked them against those of the wanted Sosa.

Based on *Cannon*, Sanchez and the other deputies who failed to take any steps to identify Sosa as the wanted Sosa were on notice that completely shirking their responsibilities—over a period of three days—while a potentially misidentified, innocent person was imprisoned could constitute deliberate indifference and violate the detainee's Fourteenth Amendment substantive due-process rights.[18] *Cf. Patel v.*

---

[18] As we have explained, we base our analysis on the facts as alleged by Sosa and viewed in the light most favorable to him. Should the actual, uncontroverted facts establish that Sanchez and the other deputies did not fail to take any readily available, easy steps to confirm Sosa's identity, in response to the information Sosa provided, within a reasonable period (considering their other pressing obligations), they would be entitled to qualified immunity.

*Lanier Cnty.*, 969 F.3d 1173, 1190 (11th Cir. 2020) (holding that the "broad principle" that "[t]he knowledge of the need for medical care and intentional refusal to provide that care" constitutes deliberate indifference had put "all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm yet do *nothing* to address it, they violate the Constitution").

Because *Cannon* made it clear that an officer's "failure to take any steps to identify" a detainee as the target of warrant is unconstitutional, Deputy Sanchez and the other deputies at the jail are not entitled to qualified immunity. 1 F.3d at 1564. For these reasons, we reverse the district court's dismissal of Sosa's overdetention claim and remand for further proceedings.

## IV.

Finally, we consider Sosa's Fourteenth Amendment substantive-due-process *Monell* claim against Martin County and the Sheriff. Under *Monell*, a plaintiff may maintain a § 1983 action against a municipal government when it has a policy, custom, or practice that causes a constitutional injury. 436 U.S. at 690-91. But a municipality cannot be held liable under § 1983 on a theory of vicarious liability. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997).

To succeed on a *Monell* claim, a plaintiff must prove that (1) something that qualifies as an official local-government policy (2) was the "moving force" that

"actually caused" (3) the plaintiff's constitutional injury. *See Connick v. Thompson*, 563 U.S. 51, 59 n.5 (2011) (citations and quotation marks omitted); *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

An official local-government policy can be a decision by a municipality's lawmaking body, an act by a policymaking official, or a municipal custom—that is, a "practice[] so persistent and widespread as to practically have the force of law." *Connick*, 535 U.S. at 61. Besides these things, a municipality's decision not to train employees on their legal duty not to violate citizens' rights can also constitute an official government policy subjecting the municipality to liability under § 1983. *Id.*; *see also Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). But to qualify as a policy, the municipality's failure to train must "evidence[] a deliberate indifference to the rights of its inhabitants." *Lewis*, 561 F.3d at 1293 (citation omitted).

Establishing deliberate indifference requires the plaintiff to "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and . . . made a deliberate choice not to take any action." *Id.* (citation and quotation marks omitted). A plaintiff may do this by pointing to evidence that municipal policymakers "are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights[.]" *Connick*, 563 U.S. at 61.

38

Generally, to satisfy this notice requirement, a plaintiff must prove a pattern of similar constitutional violations by untrained employees. *Id.* at 62. But "in a narrow range of circumstances," a plaintiff may avoid the need to show a pattern of similar violations to prove deliberate indifference. *Id.* at 63 (citation omitted). That is so when "the unconstitutional consequences of failing to train [are] . . . patently obvious," *id.* at 64, meaning that a high likelihood exists that the situation will recur frequently and that the officer's lack of specific tools to respond to that situation will predictably violate citizens' constitutional rights, *Brown*, 520 U.S. at 409. The Supreme Court has identified but a single example of this situation: a municipality's failure to train officers about the constitutional limits on the use of deadly force though arming the officers with guns and expecting to use them in the course of their duties. *See Connick*, 563 U.S. at 63; *see also City of Canton v. Harris*, 489 U.S. 376, 390 n.10 (1989).

As for *Monell*'s causation prong, when it comes to a failure-to-train claim, the plaintiff must establish that a hypothetically well-trained officer would have acted in a way that would have prevented the injury to the plaintiff. *See City of Canton*, 489 U.S. at 391.

Sosa argues that two of the County's and Sheriff's alleged "policies" caused him constitutional injury: (1) the failure to train deputies to properly verify that an individual arrested based on an outstanding warrant is, in fact, the subject of that

warrant, and (2) the lack of a policy or custom of keeping records to identify those who have previously been arrested because of misidentification on outstanding charges for another person with the same or similar name.

Here, the first alleged policy Sosa challenges—the Sheriff and Martin County's ("County Defendants") alleged failure to train deputies to correctly identify a person as a wanted person—cannot support a *Monell* claim. For starters, Martin County cannot be liable for Sosa's arrest because Sosa did not suffer a constitutional injury when he was arrested. As we explained in Section III.B, *supra*, Deputy Killough did not violate Sosa's Fourth Amendment right when he arrested Sosa on the wanted Sosa's warrant.

Martin County also cannot be liable for the lack of action by its deputies at the jail who failed to correctly identify Sosa. That is so because Sosa has failed to sufficiently allege a pattern of similar constitutional violations that would have put Martin County on notice of its need to train its deputies to correctly identify the target of a warrant. Indeed, the only constitutional violation Sosa alleges in his First Amended Complaint is the conduct that gave rise to this case. But "contemporaneous . . . conduct cannot establish a pattern of violations that would provide notice to [a municipality] and the opportunity to conform to constitutional dictates." *Connick*, 563 U.S. at 63 n.7 (cleaned up); *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 820 (11th Cir. 2017) (holding that a plaintiff cannot show

40

a pattern of constitutional violations when its only evidence "is this case itself"). As a result, Sosa has failed to allege enough facts to make out a plausible *Monell* claim on this first alleged policy.

So we turn to Sosa's second alleged policy: the failure to keep records so that those who have previously been misidentified as a wanted person will not be so misidentified again on the same warrant. This alleged policy was not passed by the local government. Nor does the need for keeping a records system to ensure a person is not mistakenly arrested twice on the same warrant for someone else with the same or similar name rise to the level of obviousness that the Supreme Court's example of the need to train officers with guns does.

So we consider whether Sosa sufficiently alleged a pattern of similar constitutional violations that should have put Martin County on notice that its deputies were regularly violating people's rights by rearresting them on the same outstanding warrant because of a misidentification error. For purposes of our analysis, we assume a meaningful difference between the duty of an individual deputy to avoid unreasonably mistakenly arresting a person as a wanted person and the duty of a sheriff's department as an entity to prevent the unreasonably mistaken rearrests of a person on a wanted person's warrant. *See Barnett*, 956 F.3d at 1301 (explaining that "municipal liability can exist if a jury finds that a constitutional

41

injury is due to a municipal policy, custom, or practice," even if "no officer is individually liable for the violation").

But even assuming that a county may inflict constitutional injury on a person by mistakenly arresting him a second time or more on the same warrant because of a misidentification, the district court did not err in dismissing Sosa's *Monell* claim. Sosa did not allege enough facts to show that the Sheriff's Department had a pattern of rearresting the wrong person on a warrant because of mistaken identity based on the arrestee's name.

True, Sosa himself was rearrested once. But as to the County's notice *at the time of Sosa's rearrest*, which is what we must evaluate, Sosa alleges only that "[u]pon information and belief Martin County has arrested many innocent individual[s] because they failed to exclude a person based upon different identifying information between the detainee and the actual person wanted for a warrant." To be sure, facts based "upon information and belief" may support a claim when facts "are not within the knowledge of the plaintiff but he has sufficient data to justify" an allegation on the matter. 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1224 (3d ed. 2012); *see also Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 730 (5th Cir. 2018). But here, Sosa points to no data other than his own rearrest (which, obviously and as we have noted, did not occur before his own rearrest) to support

his information-and-belief allegation.  *Connick*, 563 U.S. at 63 n.7; *Knight through Kerr*, 856 F.3d at 820.  For that reason, Sosa did not plead enough facts to set forth a *Monell* practice claim,[19] and the district court did not err in dismissing that claim.[20]

## V.

We affirm the district court's dismissal of Sosa's Fourth Amendment and *Monell* claims, and we reverse the district court's dismissal of Sosa's Fourteenth Amendment overdetention claim.  We remand the case to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

---

[19] Nevertheless, if the Sheriff has no policy on or practice of maintaining records concerning those who have been mistakenly arrested on a warrant for another person, because the two have the same or similar names, he takes his chances that another mistakenly rearrested person may be able to establish a pattern and practice based on Sosa's rearrest and, if appropriate, on information and belief.

[20] The County also argues that Sosa's *Monell* claim should fail because it is not a proper defendant in this case since it does not control the Sheriff's office.  We need not reach this argument because we conclude that, in any event, Sosa's *Monell* claim fails because he has not sufficiently alleged a municipal policy or custom.  As we have explained, Sosa has not alleged a pattern of similar constitutional violations that would show that the County's decision not to train its deputies constitutes an official government policy.

LUCK, Circuit Judge, concurring in part and dissenting in part:

The district court dismissed David Sosa's Fourth Amendment false arrest claim against Deputy Killough, his Fourteenth Amendment overdetention claim against Deputy Sanchez, and his Monell liability claim against the sheriff and the county for failing to institute policies and train deputies to prevent false arrests and overdetentions. The majority opinion affirms the dismissal of Sosa's false arrest and Monell claims and reverses the dismissal of his overdetention claim. I agree we should affirm the dismissal of Sosa's false arrest and Monell claims. But, because Sosa has not alleged a violation of the Due Process Clause of the Fourteenth Amendment, I would also affirm the dismissal of his overdetention claim. As to that part of the majority opinion, I respectfully dissent.

*Sosa has not alleged a violation of*
*his due process rights under Baker v. McCollan*

Baker v. McCollan, 443 U.S. 137 (1979) controls this case. There, Leonard "procured" his brother Linnie's driver's license. Id. at 140. Leonard was arrested on "narcotics charges" and was booked into the jail "masquerading" as Linnie. Id. at 140–41. Leonard, still posing as Linnie, signed paperwork and was released on bond. Id. at 141. Later, the bondsman "sought and received an order allowing him to surrender his principal and a warrant was issued for the arrest of" Linnie. Id.

Then, the real Linnie ran a red light in another county. Id. The officer who

44

stopped the real Linnie saw the warrant and took the real Linnie "into custody over his protests of mistaken identification." Id. On December 30, 1972, the real Linnie was transferred to the county where the warrant originated and held in the county jail. Id. The real Linnie "remained there until January 2, 1973, when officials compared his appearance against a file photograph of the wanted man[, his brother,] and, recognizing their error, released him." Id.

Linnie sued the sheriff for damages under the Fourteenth Amendment and section 1983, id., claiming that the sheriff "intentional[ly] fail[ed] to investigate and determine that the wrong man was imprisoned," id. at 143 (quoting Linnie's brief). The district court directed a verdict for the sheriff, but our predecessor court reversed. Id. at 141–42. The Supreme Court sided with the district court.

"[I]t is necessary," the Court began, "to isolate the precise constitutional violation with which [the defendant] is charged." Id. at 140. For Linnie, the Court said, "[a]bsent an attack on the validity of the warrant under which he was arrested, [his] complaint is simply that despite his protests of mistaken identity, he was detained in the [county] jail from December 30 . . . until January 2, when the validity of his protests was ascertained." Id. at 143–44. "Whatever claims this situation might give rise to under state tort law," the Court explained, "we think it gives rise to no claim under the United States Constitution." Id. at 144. Linnie "was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant

conforming, for purposes of our decision, to the requirements of the Fourth Amendment." Id.

"The Constitution does not guarantee that only the guilty will be arrested," the Court continued, and "[t]he Fourteenth Amendment does not protect against all deprivations of liberty." Id. at 145. "Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial," the Court did "not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." Id. at 145–46.

The Baker Court ended by quoting from our predecessor court's opinion: "We are saying that the sheriff or arresting officer has a duty to exercise due diligence in making sure that the person arrested and detained is actually the person sought under the warrant and not merely someone of the same or a similar name." Id. at 146 (quoting McCollan v. Tate, 575 F.2d 509, 513 (5th Cir. 1978)). Rejecting our reasoning, the Supreme Court concluded, "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." Id.

But the Baker Court left open a narrow exception. "Obviously, one in [Linnie]'s position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met

46

the standards of the Fourth Amendment." Id. at 144.  The Court assumed that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'"  Id. at 145 (omission in original).  "But," the Court emphasized, "we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation."  Id.

Given the Supreme Court's certainty, I think we are bound to conclude that Sosa's three-day detention on a facially valid warrant, despite his repeated claims of mistaken identity, did not and could not amount to a deprivation of his liberty without due process.  Sosa, like Linnie, was arrested on a facially valid warrant. Sosa, like Linnie, repeatedly protested his innocence.  Sosa's jailer, like Linnie's sheriff, didn't investigate the mistaken identity claim for three days.  And Sosa's jailer, like Linnie's sheriff, could easily have determined that he had the wrong person in custody by doing a simple identification match.  Taken together, the Supreme Court concluded that these facts did not allege a violation of the Fourteenth Amendment.

*The majority opinion's attempts*
*to distinguish Baker are unavailing*

The majority opinion gives six reasons why Baker is distinguishable from the facts of this case.  None of them are persuasive.

47

First, the majority opinion argues that <u>Baker</u>'s holding isn't broad enough to cover Sosa's case because the "specific type of mistaken-identity claim Linnie made" "might" have required a jury to resolve it, but no jury was necessary here to resolve Sosa's "straight-forward case of mistaken identity." Majority Op. at 25–26. But <u>Baker</u> didn't hold that Linnie's mistaken-identity claim required jury factfinding to resolve. Rather, the <u>Baker</u> Court held that the Constitution doesn't require a sheriff executing an arrest warrant "to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." 443 U.S. at 145–46. "[S]uch claims of innocence," <u>Baker</u> explained, are "placed in the hands of judge and the jury," <u>id.</u> at 146, not the sheriff or the jailer.

The crux of <u>Baker</u> is not that Linnie's mistaken-identity claim raised a jury question. The crux is that Linnie was afforded all of the protections that he was entitled to under the Fourteenth Amendment. The Supreme Court said that while Linnie's factual innocence could be relevant to a false imprisonment claim under state tort law, it was "largely irrelevant to his claim of deprivation of liberty without due process of law." <u>Id.</u> at 145. Linnie's factual innocence was irrelevant to his Fourteenth Amendment due process claim, the Supreme Court explained, because he received all of the process that he was due: (1) his arrest on a facially valid warrant justified his "pretrial restraint of liberty"; and (2) the Constitution

48

guaranteed Linnie "the right to a speedy trial," the invocation of which "need not await indictment or other formal charge." Id. at 142–44.

So too here. Sosa was arrested on a valid warrant and there is no allegation that the state abridged his right to a speedy trial in any way. Like Linnie's claim, Sosa's claim that law enforcement didn't "investigate independently [his] claim of innocence" while detaining him for three days did not establish a constitutional violation. See id. at 146. Like Linnie's claim, Sosa has "no claim cognizable under [section] 1983" because, having received the same process that Linnie received under similar circumstances and over the same three-day period, he was "deprived of no rights secured under the United States Constitution." See id. at 146–47.

Baker held that, for the three days that Linnie was in custody, so long as the arrest was made on probable cause and he was accorded a speedy trial, the sheriff was not required to investigate independently Linnie's mistaken-identity claim. Id. at 145–46. But Baker acknowledged the "[o]bvious[]," that Linnie "could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." Id. at 144. And the Baker Court "assume[d]" that "mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of 'liberty . . . without due process of law.'" Id. at 145 (omission in original). But a detention of only three

49

days over a long weekend "does not and could not amount of such a deprivation." Id. Because Sosa was held for the same three days that Linnie was held, Baker controls.

In any event, Linnie's factual innocence was just as straightforward as Sosa's. The sheriff in Baker found out he had the wrong man when he compared Linnie to the booking photo. And Deputy Sanchez found out he had the wrong Sosa based on a fingerprint match. Even if Sosa had alleged, as the majority opinion contends, that a fingerprint comparison would have taken only one minute—he didn't; Sosa alleged that during the first arrest it took three hours to determine that he wasn't the wanted Sosa—it would have taken no longer than a minute for the Baker sheriff to look at the booking photo and see that he had the wrong man. Still, the Supreme Court held that the Due Process Clause didn't require the Baker sheriff to conduct an independent investigation during the three days that Linnie was detained because he was arrested on probable cause and afforded a speedy trial. Id. at 145–46.

Second, the majority opinion contends that Baker is distinguishable because the Supreme Court "point[ed] out" that Linnie's detention took place over New Year's weekend. Majority Op. at 26–27. But the holding in Baker didn't depend on Linnie being detained over New Year's weekend any more than it depended on Linnie being arrested in Texas or that the underlying crime was drug related. It would be strange for a Supreme Court holding to apply only on federal holidays.

50

Instead, the Supreme Court held: "Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." Baker, 443 U.S. at 145–46. And the Supreme Court rejected the former Fifth Circuit's holding—"that the sheriff or arresting officer had a duty to exercise due diligence in making sure that the person arrested and detained is actually the person sought under the warrant and not merely someone of the same or a similar name"—because "false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." Id. at 146. Baker's holding didn't mention the New Year's holiday. The Baker sheriff wasn't required to conduct an independent investigation because Linnie was given all the process that he was due under the Constitution—not because it was the New Year.

And nothing in Baker indicates that New Year's weekend is known "for being a period when, traditionally, public services are not fully staffed." Majority Op. at 27. Indeed, the opposite appears to be true. Whether it's to combat crime, drunk driving, or terrorism threats, law enforcement is more, not less, active around January 1. See, e.g., Christi Parsons, Obama: U.S. in 'new phase of terrorism', Orlando Sentinel, Dec. 18, 2015, at A7, at 2015 WLNR 37625982 ("Ahead of

51

Christmas and New Year's day, Department of Homeland Security officials are warning that shoppers and travelers will see more police and tougher security checks in public places."); Police gear up for drunks, Florida Today (Melbourne, FL), Dec. 31, 2011, at 2011 WLNR 26911868 ("Police will ring in the new year with extra officers to make DUI traffic stops tonight and Sunday morning throughout Brevard County."); Police add patrols, S. Fla. Sun-Sentinel, Nov. 23, 1994, at 3, at 1994 WLNR 4565736 ("Police are beefing up patrols to help stop purse snatchings, robberies and car thefts over the holidays. Crime usually increases between Thanksgiving and New Year's Day. As a result, extra uniformed and plainclothes officers are patrolling retail areas, as well as residential areas."); Leonardo Vazquez, Police prepare for holiday crime, Miami Herald, Nov. 28, 1987, at 5, at 1987 WLNR 608393 ("Police in Broward have begun their unfortunate holiday tradition— stepped-up patrols to fight the seasonal increase in crime. From Thanksgiving to New Year's Day, the number of 'smash and grab' thefts grows, Broward Sheriff's Office spokesman Al Gordon said. . . . The sheriff's office, Hollywood police and other city police departments are appointing more officers, uniformed and plainclothes, to shopping centers for the holidays."); Police work intensifying for holidays, Miami Herald, Dec. 16, 1984, at 10, at 1984 WLNR 249604 ("For most, the Christmas holiday season means paying less attention to work and more to play. Not so for 18 police agencies in Palm Beach County. From now until the day after

52

New Year's, those police departments will increase their road patrols and will establish safety checkpoints during the early morning hours."). And if there are more officers on the streets arresting scofflaws around New Year's, there are also more at the jail to process them.

Third, the majority opinion maintains that the warrant in this case was twenty-six years old and called for the arrest of a man with "such a common name," David Sosa. Majority Op. at 29. The differences in the age and name on the warrant "raise[] more identity questions" than in Baker, the majority opinion says. Id. But the Baker Court didn't mention the warrant's age or how common Linnie's name was as factors in whether his liberty was violated without due process of law. "Absent an attack on the validity of the warrant under which he was arrested," the Baker Court explained, being held from December 30 to January 2, "despite [Linnie's] protests of mistaken identity," "gives rise to no claim under the United States Constitution." 443 U.S. at 144.

Here, as the majority opinion concludes, the warrant was valid and there was probable cause for arresting Sosa because he matched the wanted Sosa's name and sex. See Majority Op. at 15–16. The amount of probable cause supporting the arrest didn't affect the analysis in Baker because, like here, there was no attack on the validity of the warrant.

53

Also, the fact that the warrant was an old one raises fewer, and not more, questions about Sosa's identity. In Rodriguez v. Farrell, 280 F.3d 1341 (11th Cir. 2002), for example, we explained that differences in identity—like eye color, weight, and even scars—were "all easily variable, especially over six years" from when the warrant was first issued until the time of the arrest. Id. at 1347 n.14. "This variability lessens the importance of differences in these characteristics." Id. We expect people's appearances to change over time. And a common name doesn't defeat probable cause for an arrest. In Rodriguez, the plaintiff, Joe John Rodriguez, was arrested because his name matched the alias on a warrant for Joe Rodriguez. Id. at 1344. The name Joe Rodriguez is as common, if not more so, as David Sosa, yet we still held that there was probable cause to hold Rodriguez because other identifying features, in addition to his name, matched the warrant. Id. at 1347. Just like here.

Fourth, the majority opinion argues that Baker does not control because Linnie was detained in 1972 and Sosa was detained in 2018. Majority Op. at 30–31. This is important, the majority opinion explains, because "the technology law-enforcement officers used every day in 2018 remained entirely the stuff of science fiction in 1972." Id. at 30. But the police officers in Baker discovered that Linnie was innocent by "compar[ing] his appearance against a file photograph of the wanted man[.]" 443 U.S. at 141. Pulling a photograph out of a file and comparing it to a

54

detainee does not require space-age technology that Gene Roddenberry could only dream of in 1972. If anything, the procedure used to clear Linnie's name (a photo comparison) was lower-tech and easier than the procedure used to clear Sosa's (a fingerprint comparison).

The majority opinion's focus on progress in fingerprint technology confuses best police practices with the demands of due process. It is certainly good policy for the police to use the most current technology to investigate promptly a detainee's mistaken-identity claim. A legislature could (and maybe should) mandate that they do so by statute. But, as Baker tells us, the Constitution doesn't require sheriffs to investigate independently claims of mistaken identity where the arrest was made on probable cause and the arrestee enjoyed the right to a speedy trial. Id. at 145–46. That is no less true now as it was in 1972 when all the sheriff holding Linnie had to do was look at the earlier booking photo.

The majority opinion also says that, in 1972, it would have taken some time— "a few days"—for the sheriff to hunt down Linnie's case file, wherever it was, which justified the delay in identifying him. Majority Op. at 30–31. But, as the majority opinion implicitly acknowledges, the Baker Court never said that the file had to be hunted down or was in some other location far from Linnie. See id. at 31 ("[I]f the file were not located there," "presumably, it wouldn't have been," "perhaps a detective's office") (emphasis added). We don't have to presume. As the Baker

55

Court explained, the lower court faulted the Baker sheriff for not, "immediately upon [Linnie's] arrival in Amarillo," comparing him "with the file photograph and the fingerprints of the wanted man." 443 U.S. at 142. And Linnie claimed that the sheriff "intentional[ly] fail[ed] to investigate and determine that the wrong man was imprisoned." Id. at 143 (quoting Linnie's brief). Linnie sued, and the lower court ruled in his favor, because the sheriff had the file and didn't bother to investigate, despite Linnie repeatedly saying that they had the wrong man.

Fifth, the majority opinion asserts that Baker's reach is limited because, as Justice Blackmun explained in his concurring opinion, the sheriff in that case was the sole defendant and there was no indication that he was aware, or should have been aware, either of the likelihood of misidentification or of his deputies' actions. And, again relying on Justice Blackmun's concurring opinion, the majority opinion says that Baker did not foreclose the possibility that a prisoner might prove a due process violation by a sheriff who deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints. Majority Op. at 32–33.

But Justice Blackmun's concurring opinion does not limit or modify Baker's holding. It's just a concurring opinion, not the holding of the Court, and, as the Supreme Court has explained, statements "contained in a concurrence" do not

56

"constitute[] binding precedent."[1]  See, e.g., Maryland v. Wilson, 519 U.S. 408, 412–13 (1997) ("We agree with respondent that the former statement was dictum, and the latter was contained in a concurrence, so that neither constitutes binding precedent.").

Regardless, Linnie did allege in Baker an intentional failure to investigate after repeated claims of mistaken identity.  His section "1983 claim against the sheriff [was] . . . for the intentional failure to investigate and determine that the wrong man was imprisoned."  443 U.S. at 143 (quoting Linnie's brief).  The Baker Court held that, even if Linnie told the sheriff he had the wrong man, the sheriff did not have an independent duty to investigate where the arrest was based on probable cause and the arrestee had the right to a speedy trial.  See id. at 145–46.

And the sheriff's intent or deliberate indifference did not affect the Baker Court's holding.  The Baker Court explained that "[t]he first inquiry in any [section] 1983 suit . . . is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'"  Id. at 140.  "If there has been no such deprivation," the Court said, "the state of mind of the defendant is wholly immaterial."  Id. (footnote omitted).  Because Linnie "ha[d] failed to satisfy this threshold requirement of

---

[1] There are, of course, concurring opinions that can limit a majority's holding.  Where the concurring judge is the fifth judge necessary for a majority opinion, a separate opinion by the fifth judge explaining her position may limit the reach of the holding.  Or, if the concurring judge is the fifth vote for the judgment but on separate and narrower grounds, the concurring opinion may end up as the opinion for the court.  But Justice Blackmun's opinion is neither of those kinds of concurring opinions.  He was the sixth vote in a six-vote majority opinion.

[section] 1983"—that is, he had shown no deprivation of a right secured by the Constitution—the Court concluded that it didn't need to decide the level of mens rea necessary for this kind of claim. Id. Even if the sheriff was no more than negligent, Linnie did not allege a violation of his due process rights.

Finally, the majority opinion relies on the Seventh and Ninth Circuits' reading of Baker to find that it doesn't control. Majority Op. at 24, 27. But I think we should follow our consistent reading of Baker, rather than how other circuits read the opinion. In Douthit v. Jones, 619 F.2d 527 (5th Cir. 1980), for example, our predecessor court explained that "[i]n Baker the [Supreme] Court held that the detention of an individual for three days on the basis of a valid arrest warrant despite his protestations of innocence did not amount to a deprivation of liberty without due process." Id. at 532. In Pickens v. Hollowell, 59 F.3d 1203 (11th Cir. 1995), we described Baker the same way:

> The Supreme Court rejected the plaintiff's argument that the sheriff's failure to investigate his protests of misidentification constituted a violation of due process, and explained:
>
>> Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. . . . The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.

58

> Although the plaintiff in Baker did not challenge the validity of his arrest or bring a claim under the Fourth Amendment, the Supreme Court's decision in that case does suggest that the two deputies in this case—who otherwise had probable cause to arrest Pickens pursuant to facially valid arrest warrants—did not have a duty to investigate and decide the potential viability of a defense, such as the statute of limitations, before arresting Pickens.

Id. at 1207 (citation omitted; omission in original).[2]  And in Cannon v. Macon County, 1 F.3d 1558 (11th Cir. 1993), modified, 15 F.3d 1022 (11th Cir. 1994), we said that Baker "held that detention pursuant to a valid warrant but in the face of protests of innocence does not necessarily deprive one of liberty without due process.  Arresting officers and those responsible for maintaining custody of detainees are not constitutionally required 'to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'"  Id. at 1562 (quoting Baker, 443 U.S. at 146).  Critically, in none of our cases discussing Baker's holding did we mention New Year's weekend, the suspect's name, the warrant's age, fingerprint technology, or Justice Blackmun's concurring opinion.

---

[2] Pickens isn't relevant to Sosa's case because of its holding; it's relevant because it shows how we have understood Baker's holding.  Our understanding of Baker—rather than any other circuit's understanding—is what matters.

*Sosa's case is not squarely*
*within the ambit of* <u>*Cannon v. Macon County*</u>

The majority opinion also says that Sosa has alleged a constitutional violation because his case is squarely within the ambit of <u>Cannon</u>.  But it is not.

There, Mary Parrott and her family spent the night at a rest area in Georgia waiting for local relatives to come and lend them some money.  <u>Id.</u> at 1560.  While Parrott was waiting, a sheriff's deputy came by and offered to get the family aid from the local human resources department.  <u>Id.</u>  The deputy radioed in Parrott's name to the sheriff's office and got back a hit from the National Crime Information Center that "Mary E. Mann, a.k.a Mary E. Parrott, was wanted for theft by deception in Kentucky."  <u>Id.</u>  The deputy arrested Parrott and "transported her" to the jail.  <u>Id.</u>

Deputy Collins took over at the jail.  <u>Id.</u>  Parrott "repeatedly" told Deputy Collins that she was not Mary Mann.  <u>Id.</u>  Despite Parrott's protests that Deputy Collins had the wrong woman and despite Parrott's driver's license—with her legal name and actual height, eye color, social security number, and date of birth—being in the sheriff's office files, Deputy Collins filled out the arrest report with the name, height, eye color, social security number, and date of birth that were listed for Mary Mann in the National Crime Information Center database.  <u>Id.</u> at 1560–61, 1563.  The evidence strongly suggested that Deputy Collins used the information from the NCIC, even though it "differed significantly" from Parrott's actual physical

60

description and the information on her driver's license in the sheriff's files. Id. at 1563.

Because the arrest report now matched the "hit" from Kentucky, Deputy Collins held Parrott in the jail and swore out an affidavit for a fugitive warrant saying that Parrott was Mary Mann. Id. at 1560–61, 1564. Deputy Collins told Parrott that if she did not waive extradition, she would be "played back and forth like on a baseball field" between the court and the jail. Id. at 1561. So Parrott waived extradition. Id. After seven days in custody, she was transported to Kentucky. Id. The Kentucky authorities "promptly released" Parrott "when it became evident that [she] was not Mary E. Mann." Id. Parrott sued Deputy Collins for depriving her of liberty without due process because he held her "in jail for seven days without making any effort to attempt to determine [Parrott]'s identity." Id. at 1561–62.

There are two key differences that take Sosa's case out of the ambit of Cannon. First, here and in Baker, the arrest was made "pursuant to a facially valid warrant" and the arrest was not constitutionally deficient. See 443 U.S. at 143 ("In this case, respondent was arrested pursuant to a facially valid warrant, and the Court of Appeals made no suggestion that respondent's arrest was constitutionally deficient."). "[A] person arrested pursuant to a warrant issued by a magistrate on a showing of probable-cause is not constitutionally entitled to a separate judicial

determination that there is probable cause to detain him pending trial." Id. (footnote omitted).

In Cannon, on the other hand, the court didn't say that Parrott was arrested on a facially valid warrant. The deputy sheriff who questioned Parrott at the rest area and offered to help had a "'hit' from the National Crime Information Center" that "Mary E. Mann, a.k.a. Mary E. Parrott, was wanted for theft by deception in Kentucky" and arrested her because of the "hit." Cannon, 1 F.3d at 1560. And, unlike Sosa and Linnie, Parrott was being held based on a constitutionally deficient fugitive warrant. "There was substantial evidence that [Deputy] Collins did not obtain the identifying information from" Parrott, as he said he did, "but copied" the wrong information to create a match "directly from the NCIC report" and then used the wrong information to get the warrant. Id. at 1560–61, 1563–64; see Madiwale v. Savaiko, 117 F.3d 1321, 1326 (11th Cir. 1997) ("In Franks v. Delaware, 438 U.S. 154, 171 (1978), the Supreme Court held that a search warrant is void under the Fourth Amendment if the affidavit supporting the warrant contains 'deliberate falsity or . . . reckless disregard' for the truth." (omission in original)).

The second key difference in Cannon is that Parrott was held for seven days and not for three like Linnie and Sosa. This difference is constitutionally significant. Describing Baker's holding, we acknowledged in Cannon that "detention pursuant to a valid warrant in the face of protests of innocence does not necessarily deprive

62

one of liberty without due process" and "[a]rresting officers and those responsible for maintaining custody of detainees are not constitutionally required 'to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent.'" 1 F.3d at 1562 (quoting Baker, 443 U.S. at 146).

But the Cannon court also acknowledged the narrow exception in Baker that "[u]nder certain circumstances . . . detention on the basis of misidentification may present a viable [section] 1983 claim." Id. As we said in Cannon: "The Baker Court recognized . . . that after the lapse of a certain amount of time, continued detention in the face of repeated protests will deprive the accused of liberty without due process." Id. (citing Baker, 443 U.S. at 144). Deputy Collins's detention of Parrott for seven days without "tak[ing] any steps to identify [Parrott] as the wanted fugitive," the Cannon court concluded, was a lapse long enough to trigger Baker's narrow exception. Id. at 1564.

Unlike Parrott, Linnie and Sosa were both only held for three days (and they were held on a facially valid warrant). "In Baker the [Supreme] Court held that the detention of an individual for three days on the basis of a valid arrest warrant despite his protestations of innocence did not amount to a deprivation of liberty without due process." Douthit, 619 F.2d at 532 (emphasis added). As the Baker Court explained,

63

"we are quite certain that a detention of three days over a New Year's weekend does not and could not amount to such a deprivation." 443 U.S. at 145.

The majority opinion rightly reminds us that a holding can reach no further than the facts and circumstances presented to the court. Majority Op. at 24. For that reason, Cannon is limited to cases where the arrestee is held on an invalid warrant and where she is held for at least seven days. That's how we've understood Cannon. In Rodriguez, we found that any constitutional violation in that case was not clearly established by Cannon because "Cannon concluded that an official at a police station was liable for failing to identify correctly the plaintiff during seven days of incarceration under the official's care." 280 F.3d at 1350 (emphasis in original). (The Rodriguez plaintiff was held by the roadside and he wasn't held for seven days.) The Rodriguez Court italicized "seven days of incarceration" to emphasize why Cannon didn't apply in that case.[3] I underline it here to emphasize why Sosa's case is not squarely within the ambit of Cannon.

\* \* \* \*

Under Baker, Sosa's three-day detention on a facially valid warrant did not violate his due process rights. Because we are bound by Baker, I would affirm the district court's dismissal for Deputy Sanchez on Sosa's overdetention claim.

---

[3] The majority opinion relies on how other circuits have described Cannon's holding, Majority Op. at 27 n.7, but not on how we've understood our own precedent.

64